# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **TANGELIA DOSHIE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 4:18CV876 PLC** |
| **vs.** | ) | |
| | ) | |
| **ANDREW M. SAUL,[1]** | ) | |
| **Deputy Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

Plaintiff, Tangelia Doshie seeks review of the decision by Defendant Social Security Commissioner Andrew M. Saul denying her applications for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act. For the reasons set forth below, the case is reversed and remanded.

### I.    Procedural History

On July 16, 2014, Plaintiff, then forty-five years old, filed an application for a period of disability and Disability Insurance Benefits, alleging that she became disabled on February 1, 2014 due to: "migraine headaches; cervical spine injury and constant pain; a cyst drained from the front lobe of my brain; major depression; asthma; severe peptic ulcers; and anxiety." (Tr. 69) The Social Security Administration ("SSA") denied Plaintiff's claims, and she filed a timely request for a hearing before an administrative law judge ("ALJ"). (Tr. 112-13)

---

[1] At the time this case was filed Nancy A. Berryhill was the Deputy Commissioner of Social Security.

The ALJ conducted a hearing in March 2017 at which Plaintiff and a vocational expert testified.[2] (Tr. 43-67) In a decision dated September 6, 2017, the ALJ found that Plaintiff "has not been under a disability within the meaning of the Social Security Act from February 1, 2014, through the date of this decision." (Tr. 16) Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review. (Tr. 1-4) Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II. Evidence Before the ALJ

### A. Testimony

At the hearing, Plaintiff testified that her depression and anxiety stemmed from trauma in both her early and adult life. (Tr. 51-52) She stated that she was molested throughout her childhood, her grandchild died, and she suffered PTSD from past trauma. Id. Plaintiff previously worked as a "collections escalation forbearance manager" for thirteen years, until the "job ended." (Tr. 53) Plaintiff "tried to go through the training" to transition from collections work to sales, but she "couldn't grasp the new material." (Id.) When the ALJ observed that Plaintiff had "a really long work history, very stable," Plaintiff explained, "I thought working was helping, I didn't have all of the other physical problems that I have now." (Tr. 52)

Plaintiff was employed when she "had my surgery for my brain injury." (Tr. 52) The surgery and treatment relieved the "swelling and pressure" for a time, but now "it hurts so bad to try to even get out of bed sometimes." (Id.) In regard to her neck pain, Plaintiff stated: "I need two discs replaced. I have bone spurs, herniated disks with a pinched nerve that I need surgery to fix. Limits me to raising my arms above my head." (Tr. 55) Plaintiff testified that her knee

---

[2] In June 2017, Plaintiff filed an application for Supplemental Security Income, which "was escalated to the hearing level and joined with the pending Title II application." (Tr. 15)

pain was worse in the right knee than the left. (Tr. 56) Her right knee "stays swollen, it's more painful…goes out more, it's more unstable and causes me to lose my balance more, I fall easily." (Id.)

As a result of her "neck issues," Plaintiff needed her mother's help to brush her hair and dress "a lot of times." (Tr. 55) Standing for longer than ten minutes aggravated Plaintiff's back pain. (Tr. 57) Because she needed to stop and rest, Plaintiff's morning routine, which involved brushing her teeth, washing her face, and using eye drops, "took longer than ten to fifteen minutes."(Tr. 58)

Plaintiff began using a cane in summer 2016. (Id.) Around the same time, Plaintiff experienced significant weight gain, which she attributed to Seroquel. Plaintiff stated that, at her heaviest, she weighed over 325 pounds, but she lost some of the weight when she discontinued the medication and changed her eating habits. (Tr. 59-60)

Plaintiff did not like crowds and preferred to be alone or in a small group. (Tr. 51, 61) Plaintiff also testified that she would often "forget the simplest things, like where I put my glasses or what I went in the room for.  I have to ask my mother a lot of things, a lot of it simple and then I get upset…."  (Tr. 60) Plaintiff stated she had "used marijuana in the past" because "it was supposed to help with anxiety," but, in her experience, it "sort of made it worse." (Tr. 51) Plaintiff denied using cocaine. (Id.)

The vocational expert testified that Plaintiff's past work as a collection clerk was classified as skilled sedentary work. (Tr. 62) The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education, and work history who was:

> limited to work at the light exertion level in that they can lift, carry, push or pull [twenty] pounds occasionally, ten pounds frequently. Can sit for six hours in an eight-hour workday, but can only stand or walk for four hours in an eight-hour workday. Can never climb ropes, ladders or scaffolds. Can frequently crouch or

crawl. May only frequently reach overhead. May only frequently feel with the upper left extremity.

(Tr. 62-63) The vocational expert testified that such an individual could perform Plaintiff's previous work. (Tr. 63)

The ALJ asked the vocational expert to consider the same individual "but also add that the individual is limited to simple, routine tasks with minimal changes in the job setting and duties. No handling of customer complaints and no fast-paced production work." <u>Id.</u> The vocational expert stated that such an individual could not perform Plaintiff's past work but could perform jobs requiring light, unskilled labor, such as packers, wrappers, product inspectors, and production workers. <u>Id.</u> Finally, the ALJ asked the vocational expert to consider all of the limitations from the second hypothetical and "reduce it down to the sedentary exertion level in that the individual could lift, carry, push or pull ten pounds occasionally, less than ten pounds frequently. They could only stand or walk for two hours in an eight-hour workday." The vocational expert stated that such an individual could perform the unskilled, sedentary jobs of product inspector and assembler. (Tr. 64)

B. Relevant Medical Records

Plaintiff's earliest medical record is from an appointment with her psychiatrist Dr. Walker in February 2014. (Tr. 399) Plaintiff informed Dr. Walker that she was "doing pretty well" but reported "some mild continuing s[ymptoms] of depression." (<u>Id.</u>) Dr. Walker noted that Plaintiff "took severance from [her] job last June" and was "now looking for work." (<u>Id.</u>) Dr. Walker diagnosed Plaintiff with major depressive disorder but observed that she was "doing reasonably well given ongoing stressors including father's cancer and treatment. States she has taken and done with current meds." (Tr. 401) Dr. Walker continued Plaintiff's gabapentin, fluoxetine, and divalproex sodium, and he discontinued her trazodone. (Tr. 399, 402)

In June 2014, Plaintiff visited her primary care physician, Dr. Simmons, for treatment of pain and spasms in her neck and "burning" in her right shoulder and arm. (Tr. 410) On examination, Dr. Simmons noted tenderness to palpitation and decreased range of motion in Plaintiff's neck. (Id.) Dr. Simmons prescribed baclofen, Voltaren, and tramadol. (Id.) X-rays of Plaintiff's cervical spine performed later that month revealed "moderately severe cervical spondylosis most evidence at C5-6 and C6-7 with bilateral foraminal narrowing due to posterior vertebral body osteophytes." (Tr. 415)

At her follow-up appointment with Dr. Simmons in August 2014, Plaintiff continued to complain of neck spasms and tingling and numbness on her left side, as well as continuous head pain lasting one week. (Tr. 409) Dr. Simmons increased Plaintiff's baclofen and ordered physical therapy and an MRI of Plaintiff's brain and cervical spine. (Id.) The MRI of Plaintiff's cervical spine showed: "prominent degenerative disc disease….The most severe disease is noted at C5-6 where there is a broad-based right-sided subligamentous disc protrusion that effaces the right side of the cervical spinal cord." (Tr. 414) The MRI of Plaintiff's brain confirmed "a 3.9 cm cystic mass lesion…in the right frontal lobe," which was "slightly increased in size comparison to the prior study done in 2000."[3] (Tr. 423)

Plaintiff began physical therapy in early September 2014. (Tr. 428) When Plaintiff returned to Dr. Simmons' office later that month, she complained of continued pain on her right side. (Tr. 478)

In October 2014, Plaintiff saw Dr. Walker and described her condition as "[p]retty rough. The pinched nerve in my neck is really acting up." (Tr. 813) Plaintiff reported continued symptoms of depression and her primary complaints were insomnia, "made worse by neck pain,"

---

[3] The MRI results noted that Plaintiff's "past surgical history is significant for a cyst in the right frontal parietal area that was drained surgically." (Tr. 423)

and irritability. (Id.) Plaintiff suffered migraines and her "aunt takes her to church, otherwise she tends to isolate." (Id.) Plaintiff stated that she was in a car accident in January, which caused her to suffer a "thigh contusion and neck injury." (Id.) In regard to employment, she stated she "doesn't miss work and is too irritable to do the job now." (Id.)

Later that month, Plaintiff saw Dr. Chamoun, a neurosurgeon. (Tr. 435-36) Plaintiff primary complaints were "neck pain and bilateral arm numbness and weakness, as well as dizziness and ataxia." (Tr. 435) Dr. Chamoun reviewed the MRI of Plaintiff's brain and cervical spine and opined that the intracranial cyst "is consistent with benign neuroglial cyst. At this point, there is no significant mass effect from the cyst, and I don't think the cyst is causing her symptoms." (Tr. 435) Dr. Chamoun referred Plaintiff to Dr. Woodrow at the Spine Center. (Id.) At that time, Plaintiff's medications included baclofen, Voltaren, gabapentin, and hydrocodone/acetaminophen. (Tr. 436)

In November 2014, Plaintiff informed Dr. Walker that she was "pretty rough still with my neck" but her sleep was "somewhat better." (Tr. 808) Plaintiff believed her "neck problems [were] aggravated by [a car] wreck," and she "reported fatigue/lethargy, sleeping pattern disruption, and chronic pain but no other constitutional issues." (Tr. 808, 809) Additionally, Plaintiff complained of "frequent headaches," and "feeling depressed, anxiety, insomnia, excessive moodiness, and stress…." (Tr. 809) Dr. Walker observed "little benefit at this time from fluoxetine" and prescribed mirtazapine, "which should help her sleep, agitation, and perhaps her pain." (Tr. 810)

In December 2014, Dr. Woodrow ordered a cervical x-ray and confirmed "severe joint space narrowing" at C5-C6 and C6-C7. (Tr. 481) Dr. Woodrow examined Plaintiff and noted normal range of motion of the cervical spine and, on motor testing, "normal bulk and tone

throughout with 5/5 power throughout the upper and lower extremities bilaterally." (Tr. 483) Plaintiff rated her pain as a six on a ten-point scale. (Id.) Dr. Woodrow opined that Plaintiff "would benefit from a cervical decompression, likely 2 level ACDF to help with her upper extremity symptoms" but it was "hard to say what will happen with her neck pain per se. It seems a little bit out of proportion to her imaging." (Id.) Dr. Woodrow ordered a CT scan and epidural steroid injections. (Tr. 484)

Later that month, Plaintiff saw Dr. Simmons for treatment of sinusitis and cervical nerve route impingement. (Tr. 595) Dr. Simmons noted: "The neck has mild anterior cervical adenopathy" and "tenderness bilaterally with some muscle spasm." (Tr. 596)

Also in December 2014, a psychologist, Dr. Bean, performed a consultative evaluation at the request of Disability Determination Services. [4] (Tr. 441-44) During the consultation, Plaintiff reported having "bipolar schizophrenia," migraine headaches stemming from her cyst that could last "up to two or three weeks," "neck problems," and related "problems with her left arm including weakness and numbness." Id. She stated that she took medication for her migraine headaches, ulcers, mental health issues, insomnia, and anxiety. (Tr. 442) She reported that those medications were not very helpful. Id.

Plaintiff informed Dr. Bean that she worked for "about 13 years doing customer service and collection work," which "she very much enjoyed and she was good at it." (Id.) Plaintiff explained that, when her former employer eliminated her department in June 2013, they offered her a sales position, but she declined "feeling she was not good for that type of work." (Id.) Plaintiff accepted a severance package and "has continued to look for work in the customer care and collections field but has been unable to find anything." (Id.)

---

[4] Dr. Bean only reviewed one medical note from Dr. Walker dated February 2014. (Tr. 441)

Plaintiff stated that she had "numerous friends" who "g[o]t together at least weekly" to play board games and video games. Id. She also informed Dr. Bean that she enjoyed reading and cooking and was "very active with her church[.]" (Id.) Plaintiff lived with her adult daughter, three grandchildren, and eighteen-year-old son. (Id.) Plaintiff stated that she "[did] her best to keep the house clean" but worked slowly because of the weakness in her arm and hand. Id. Dr. Bean noted that Plaintiff was "able to bathe, dress, and groom herself" but sometimes needed assistance from her daughter. (Id.) Plaintiff could drive and would run errands "for herself and the household." (Id.) She reported doing light housework but noted that even relatively light items, like a casserole dish, could present a challenge because of her left arm weakness. (Tr. 442-43) She walked "slowly with a somewhat stumbling gait but [did] not use any assistive devices." (Tr. 443)

In regard to her mental health, Plaintiff reported she was hospitalized in 2009 with suicidal ideation but she no longer had "thoughts of this sort." Id. Dr. Bean observed that Plaintiff's affect was primarily dysphoric though "punctuated at times with laughter or smiling related to appropriate content." (Id.) He opined that her thought processes were "logical and goal directed" with no "delusional content and…no indications of obsessions or compulsions." (Id.) Plaintiff was well oriented with "[p]ractical reasoning and social judgment skills" intact. (Id.) Dr. Bean summarized his opinion of Plaintiff's capabilities as follows:

> It would appear that [Plaintiff] is capable of appropriately and responsibly managing her own finances. She appears to have the capacity to develop and maintain relationships and to interact effectively with others. She appears capable of understanding and performing tasks with appropriate training, monitoring and supervision. Today she does not demonstrate any apparent difficulty with focus, attention, or concentration. Performance may be occasionally impacted in a negative fashion by depressive symptoms or situational challenges.

(Tr. 444)

8

In March 2015, Plaintiff returned to Dr. Simmons' office with complaints of pain in her neck, back, and head, as well as depression and poor sleep. (Tr. 591) Dr. Simmons noted that Plaintiff was "in another motor vehicle accident on 1/18. This seemed to aggravate everything prior." (Id.) Plaintiff reported that she was experiencing "some balance issues" and recently fell. (Id.) Dr. Simmons noted that Plaintiff was "frequently tearful," "tender in the occipital area into the neck bilaterally but more on the left" "with some spasm," "tender in the lower back bilaterally," and she had "some spasm." (Tr. 592) Plaintiff's Spurling test was negative and the strength of her lower extremities was "5/-5 with some questionable effort." (Id.) Dr. Simmons discontinued Plaintiff's baclofen and prescribed amitriptyline, Celexa, cyclobenzaprine. (Tr. 591)

In August 2015, Plaintiff presented to the emergency room with headache, neck pain, and left shoulder pain, with intermittent numbness to left arm. (Tr. 546) Plaintiff had run out of her nabumetone and Vicodin, and she rated her pain at 10/10. (Id.) Upon examination, Plaintiff demonstrated full, painless range of motion and normal gait, and she appeared alert, oriented, and in no acute distress." (Id.)

In November 2015, Plaintiff presented to the Research Medical Center's psychiatric center with symptoms of "consistent depression and marijuana abuse," and she was admitted for treatment. (Tr. 534) During her stay, doctors diagnosed Plaintiff with bipolar mood disorder, type 2 and marijuana abuse, and they: discontinued Plaintiff's Celexa; prescribed trazodone for sleep and Paxil for depression and anxiety; increased Plaintiff's Lamictal for bipolar depression and gabapentin for mood stability; and continued Plaintiff's Valium as needed for sleep and anxiety. (Tr. 534-35) The facility discharged Plaintiff four days later. (Tr. 534)

Plaintiff returned to the psychiatric facility on December 30, 2015 with complaints of "suicidal ideation with plan." (Tr. 527) Plaintiff had not been taking her medications consistently. (Tr. 523) Dr. Brown diagnosed Plaintiff with "bipolar mood disorder, type 1, depressed, severe without psychosis" and marijuana abuse. (Tr. 522) Doctors adjusted Plaintiff's medications and discharged her on January 7, 2016 in "improved condition." (Tr. 523)

Plaintiff was readmitted to the psychiatric facility five days later, on January 11, "due to suicidality." (Tr. 518) During her stay, Plaintiff "attempted to fashion a noose out of sheet to hang herself" and "was placed on 1:11 and remained on a 1:1 for approximately 3 days." (Tr. 518) Doctors increased Plaintiff's Paxil, prescribed Norco for breakthrough pain, and continued her diazepam, gabapentin, Lamictal, and trazodone. (Id.) Plaintiff was stabilized and discharged on January 21 with diagnoses of: "major depressive disorder, recurrent, severe, without psychotic features"; "posttraumatic stress disorder, chronic;" and cannabis abuse. (Tr. 519)

In May 2016, Plaintiff underwent a psychiatric evaluation assessment. (Tr. 646) Plaintiff reported that she "has been depressed for years, and [P]rozac used to work for her, but not anymore." (Id.) Plaintiff's mental status exam showed that Plaintiff's mood was depressed, anxious, and hopeless, but her affect, speech, and thought content were normal. (Tr. 653-54) Dr. Skirchak diagnosed Plaintiff with depressive disorder and panic disorder without agoraphobia. (Tr. 664) Dr. Skirchak recommended restarting Celexa for mood/anxiety and Valium for anxiety, increasing trazodone, and adding Elavil. (Tr. 650) Later that month, Plaintiff began individual therapy with a licensed clinical social worker. (Tr. 669)

Plaintiff was readmitted to the Research Medical Center's psychiatric facility on July 1, 2016. (Tr. 501) Plaintiff complained of suicidal ideation and reported that her brother-in-law sexually assaulted the previous day. (Id.) Doctors continued Plaintiff's Valium, Paxil, and

Lamictal, and added Seroquel for "intense anxiety" and prazosin for nightmares. (Tr. 501) The attending physician noted that Plaintiff had "a couple instances of deceitfulness regarding her housing situation" and "[i]n the end, the plan was for her to move back to St. Louis to live with her biological mother and to transfer her care there." (Id.) Plaintiff was discharged on July 18. (Id.)

On July 25, Plaintiff met with an intake specialist at BJC Community Mental Health Center in St. Louis. (Tr. 798) The intake specialist assigned Plaintiff a community support specialist (CSS) to support Plaintiff at all medical and psychiatry appointments and assist Plaintiff with managing her moods, using coping skills, and joining a support group. (Tr. 799)

Plaintiff established care with Dr. Bohnenkamp at BJC Behavioral Health on August 8, 2016. (Tr. 779) Plaintiff complained of anxiety and depression and explained that she had relocated to St. Louis one week earlier "in the context of multiple severe psychosocial stressors - chronic homelessness and an abusive relationship." (Id.) Dr. Bohnenkamp noted that Plaintiff was "restless, anxious, tearful, frequently gets out of her chair and takes deep breaths while mom fans a newspaper at her." (Id.) Dr. Bohnenkamp suggested hospitalization, which Plaintiff declined, and he restarted Plaintiff's Paxil and Lamictal. (Tr. 780)

Plaintiff, accompanied by her CSS, returned to Dr. Bohnenkamps's approximately one week later because she "was having a panic attack at the time [of the in-take appointment] and unable to give very much info." (Tr. 781) Plaintiff stated she would like to resume taking Cymbalta because it "was helping more with her pain." (Id.) She continued to experience some problems with low mood and anxiety. Sleep is fair." (Id.) Dr. Bohnenkamp diagnosed Plaintiff with bipolar disorder and decided to taper Paxil and titrate Cymbalta. (Tr. 784)

Plaintiff, again accompanied by her CSS, also visited Dr. Ralph in August for "problems with her right knee but also pain throughout." (Tr. 843) An x-ray of Plaintiff's right ankle performed later that month showed "diffuse soft tissue swelling." (Tr. 857) An MRI of Plaintiff's right knee showed: "subtle tear of the anterior horn of the lateral meniscus, anterior lateral joint effusion, and patellar tendonitis." (Tr. 851) Dr. Ralph recommended Nurse Practitioner Sandler write Plaintiff a prescription for Celebrex. (Tr. 843)

On August 29, Plaintiff established care for chronic pain with Dr. Ali. (Tr. 608) Dr. Ali documented spasms in Plaintiff's lumbar spine and positive straight leg raise test on the right. (Id.) X-rays of Plaintiff's lumbar spine revealed spinal dysraphism, and x-rays of her cervical spine showed cervical spondylosis and "straightening of the normal lordotic curvature." (Tr. 610-11) X-rays of Plaintiff's thoracic spine revealed "mild and old compression deformities...at T7 and T8." (Tr. 613)

Plaintiff returned to Dr. Ralph on August 31. (Tr. 837) Her right knee was "feeling better although she was having some subjective complaints" and there "still [was] swelling about the left ankle," possibly attributable to "a gouty attack." (Id.) Dr. Ralph noted that the Celebrex appeared to be working, and he injected her left knee with lidocaine, Marcaine, and cortisone. (Id.)

When Plaintiff followed up with Dr. Ralph in September 2016, she reported that "her right knee has flared up." (Tr. 842) Dr. Ralph recorded that is was "difficult to say" if her right knee was swollen again," but observed that "her labs are not all that abnormal" and her MRI showed "some minor changes" that he did not think were significant. (Id.) Dr. Ralph expressed concern that there was "something more physically going on, but there also may be a

psychological overlay." (Id.) He injected her right knee with lidocaine, Marcaine, and cortisone. (Id.)

That month, Plaintiff also followed up with Dr. Bohnenkamp. (Tr. 785) At that time, she had "stopped taking the Cymbalta for unclear reasons and restarted the Paxil….She denies any [side effects] from the Lamictal, but reports it is not helping with irritability or anxiety." (Tr. 785) Dr. Bohnenkamp tapered Plaintiff's Lamictal, prescribed lithium, and continued Paxil. (Tr. 788) In October 2016, Plaintiff's CSS noted that Plaintiff had obtained a "chore worker to help with daily living and reminders to take medication daily." (Tr. 800)

Plaintiff returned to Dr. Ali's office in November 2016, and she reported that her pain interfered with her activity, sleep, mood, and stress somewhat less than it had on previous visits. (Tr. 578) She also stated that the Tramadol was not working for her. (Tr. 577) Dr. Ali discontinued tramadol and started Norco. (Id.)

Plaintiff also met with orthopedic surgeon Dr. Chien in November. (Tr. 735) Plaintiff complained of pain in her lower back, as well as "shooting pain to her legs as well as her neck." (Tr. 735) Despite recent injection from Dr. Ali, Plaintiff was "still complaining constant throbbing, aching pain, with intermittent sharp pain on her back," "burning sensation in her legs," "some stiffness and spasm on her back, and shooting pain…worse on the right leg compared to the left leg." (Id.) Plaintiff had difficulty bending her back and getting up from chairs. (Id.) A musculoskeletal examination revealed:  pain with palpation over spinous process and paraspinal muscle of the lumbar spine; pain with flexion/extension of lumbar spine, muscle spasm over the paraspinal muscles of lumbar spine; positive straight leg raising test on the right; no pain with rotation of hips, and muscle strength +5/5 in both legs. (Tr. 736) Dr. Chien

recommended a caudal epidural steroid injection with corticosteroid injection of the right nerve root, which he administered ten days later. (Tr. 739)

When Plaintiff followed up with Dr. Chien later that month, she reported "some improvement in symptoms" but still had "persistent pain shooting to the right buttocks region." (Tr. 750) Plaintiff complained of pain with "prolonged standing and walking" and rated the pain at about 4/10. (Id.) Plaintiff was taking Norco, baclofen, gabapentin, Tylenol, and Lidoderm patch. (Id.) Plaintiff's musculoskeletal exam was similar to the previous one. (Tr. 751) Dr. Chien recommended a caudal epidural steroid injection with corticosteroid injection of the right L4 nerve root, which he administered ten days later. (Id.)

Dr. Chaganti performed a psychiatric examination of Plaintiff in December 2016. (Tr. 702-05) The mental status exam stated that Plaintiff's mood and affect were anxious. (Tr. 704) Plaintiff was oriented to person, place, and time with clear and goal-directed speech, sequential flow of thought, and average intelligence. (Tr. 703-04) Dr. Chaganti also noted that Plaintiff's sleep was poor, energy was decreased, and recent memory was "not intact," and concentration was "limited." (Id.)

Later that month, Plaintiff visited Dr. Snyder, a neurosurgeon, reporting "increased amounts of falls over the past few months," including a "very bad fall" that day, as well as headaches and decreased visual acuity. (Tr. 689) A review of systems showed that Plaintiff endorsed nausea, headache, visual changes, and chronic pain. (Tr. 690) Dr. Snyder also observed that Plaintiff was able to move upper and lower extremities "to instruction with grossly intact strength, 4+/5 weakness of bilateral hip flexors. No drift is appreciated. Able to stand and walk with wide based gait." (Tr. 691) Dr. Snyder opined that Plaintiff "may be discharged from neurosurgical standpoint" but recommended "medical evaluation of chronic falls." (Tr. 692)

In January 2017, Dr. Ali completed a residual function capacity ("RFC") assessment. (Tr. 588-89) He diagnosed Plaintiff with "low back pain, knee [osteoarthritis] pain, [and] neck pain/spasm" and recorded her prognosis as "fair." (Tr. 588) On a checklist form, Dr. Ali marked the following symptoms: "increased muscle tension/spasm," "pain," and "headaches." (Id.) Dr. Ali opined that Plaintiff could sit and stand/walk for less than two hours in an eight work day. (Id.) He estimated that Plaintiff would require unscheduled, five- to ten-minute work breaks every forty-five minutes to an hour, and she would need to be able to elevate her right leg while sitting and shift positions at will from sitting, standing or walking. (Id.) Dr. Ali noted that Plaintiff required a cane for "occasional standing/walking." (Id.)

On the form, Dr. Ali marked that Plaintiff could occasionally lift/carry up to fifty pounds, "occasionally – to - frequently" climb stairs, and frequently reach in all directions, handle, finger, and feel. (Tr. 588-89) Dr. Ali affirmed that Plaintiff's anxiety contributed to her symptoms and functional limitations. (Tr. 589) Although he noted that Plaintiff's pain was frequently "sufficiently severe to interfere with attention and concentration," he estimated that Plaintiff would be off task less than ten percent of an eight-hour work day and would "never" require redirection. (Id.) Dr. Ali wrote that Plaintiff would have "no difficulty" working a full-time job on a sustained basis "if following limitations, precautions, [and] treatment plan." (Id.)

In February 2017, Plaintiff returned to Dr. Bohnenkamp's office, accompanied by her mother. (Tr. 789) She explained that she had started seeing Dr. Chaganti, but returned to BJC because she lost her Medicaid. (Id.) Plaintiff reported "uncontrolled anxiety, frequently crying spells and per mom, mood swings." (Id.) Dr. Bohnenkamp continued the medications prescribed by Dr. Chaganti, but planned to obtain Plaintiff's recent medical records to determine whether to restart either lithium or Depakote. (Tr. 793)

Plaintiff presented to Dr. Ralph in May 2017 with complaints of left shoulder pain. (Tr. 831) Dr. Ralph noted Plaintiff's flat affect and that she "raises her shoulder in a very slow, nonanatomic way." (Tr. 831) He wrote: "I suspect that she has some mild adhesive capsulitis. Her symptom magnification is very substantial." (Id.) Plaintiff's range of motion "with encouragement is a lot better than it is initially." (Id.)

Later that month, Plaintiff followed up with neurologist Dr. Bucholz about the cyst in her brain. (Tr. 866) Plaintiff reported that her headaches had improved, but she complained of "constant, sharp neck pain which radiates down her left arm. . . . It is constant and worsened by activity," and she expressed concern that her fine motor movements and dexterity were diminishing on the left side. (Id.) A motor exam was "significant for left sided upper extremity weakness," however, Plaintiff was "not participatory in individual muscle testing." (Tr. 867) Dr. Additionally, Plaintiff's sensation was decreased throughout the left side and her gait was antalgic. Id.

Dr. Bucholz reviewed recent MRIs and found "no acute intracranial abnormality. Well-defined, intra-axial, cystic structure without solid component or enhancement…in the right frontal lobe is unchanged since 10/31/16." (Tr. 867) An MRI of her cervical spine revealed "multilevel degenerative disc and joint disease most pronounced at C5-6 with diffuse disc bulge resulting in moderate central canal stenosis an[d] moderate bilateral neural foraminal stenosis." (Id.) Dr. Bucholz also identified T2 hyperintense right thyroid nodule and a left thyroid nodule. (Tr. 869)

In August 2017, Plaintiff saw Dr. Ali for left shoulder pain. (Tr. 39) Dr. Ali ordered an MRI of Plaintiff's left shoulder, which revealed "smart partial tears of the supraspinatus" and "mild strain of the deltoid muscle." (Tr. 39-40)

### III.    Standard for Determining Disability Under the Act

Eligibility for disability benefits under the Act requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy…" 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520. These steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

### IV.    The ALJ's Determination

The ALJ applied the five-step evaluation process set forth in 20 C.F.R. § 404.1520(a) and found that Plaintiff had the following severe impairments:

> [M]ajor depressive disorder/bipolar disorder, marijuana abuse, post-traumatic stress disorder, borderline personality disorder, obesity, degenerative disc disease of the cervical spine, bifid spinous process of S1, compression fractures of the thoracic spine, asthma, cystic lesion of the brain/headaches, status post open reduction and internal fixation of the ankle, and mild joint disease knees.

(Tr. 17-18) However, the ALJ found that Plaintiff's severe impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18) The ALJ determined that Plaintiff had the RFC to perform a range of light work with the following limitations:

> [C]laimant can lift, carry, push, or pull 20 pounds occasionally and 10 pounds frequently; sit or six hours in an eight-hour workday; stand or walk for four hours in an eight-hour workday; never climb ropes, ladders, or scaffolds; frequently crouch or craw; may only frequently reach overhead; may only frequently feel with the left upper extremity; only occasional exposure to vibration; no exposure to unprotected heights or hazardous machinery; and only endure occasional exposure to respiratory irritants such as dust, fumes, odors, gases, and poor ventilation in the workplace. Additionally, the claimant is limited to simple, routine tasks with minimal changes in job setting and duties; no handling of customer complaints; and no fast-paced production work.

(Tr. 20)

The ALJ reviewed Plaintiff's testimony, work history, and medical records. (Tr. 21-29) The ALJ emphasized inconsistencies in the dates and reasons Plaintiff provided for leaving her job. For example, the ALJ noted that Plaintiff testified at the hearing that "[s]he stopped working when her company offered her a buyout and her job was outsourced." (Tr. 21) However, on her application for Disability Insurance Benefits, Plaintiff alleged that: her date of onset was her last day of work in January 2014; her conditions "became serious enough to keep [her] from working" in January 2013; and she stopped working "because of my condition(s)" and "because of other reasons." (Tr. 21, 217) The ALJ opined: "[I]f one is to conclude that claimant ceased working because of her impairments, which she alleged by alleging disability as of her alleged onset date, one would expect to see a dramatic increase in symptoms or [] that she had a substantial injury or mental health hospitalization as of either January of 2013 or January of 2014. Neither occurs in this case." (Tr. 21)

In regard to Plaintiff's physical impairments, the ALJ found that Plaintiff's "allegations of spinal impairments predate[d] her alleged onset date" and that, despite her impairments, Plaintiff "had full upper extremity range of motion and normal gait, normal spinal range of motion and inspection, and painless range of motion." (Tr. 22) The ALJ acknowledged that during a 2015 examination Plaintiff attributed her back pain to a car accident. (Id.) However, the ALJ noted that Plaintiff's exams at the time showed a "normal gait" and a "normal spine." (Tr. 22-23) The ALJ considered that if, immediately after the car accident, Plaintiff "were as significantly limited in her functioning as she allege[d], one would expect to see some strength loss, range of motion loss, or other evidence of impairment." (Tr. 23)

The ALJ acknowledged that while, Plaintiff presented objective evidence of some orthopedic impairments, "her more current records show great stability." (Id.) The ALJ referenced Plaintiff's "multiple joint scans" and noted that the "only one indicating any abnormality" was an MRI of Plaintiff's right knee, which Dr. Ralph deemed "not that significant." (Id.) The ALJ also cited Dr. Ralph's statement that Plaintiff exhibited "very substantial" symptom magnification. (Id.)

The ALJ acknowledged that Dr. Ali was a treating physician and considered Dr. Ali's medical opinion. (Tr. 24) Dr. Ali opined that Plaintiff: could sit, stand or walk no more than two hours per day; would need to take breaks every forty-five minutes to an hour while at work; required a cane to ambulate; and frequently had pain that interfered with her attention and concentration. (Id.) The ALJ gave little weight to this opinion because, she found, it was "seemingly inconsistent." (Id.) The ALJ explained that while Dr. Ali stated that Plaintiff would have frequent problems with her attention and concentration, he also stated that she would be off task ten percent or less of an eight-hour working day. (Id.) The ALJ stated that Dr. Ali's opinion

of Plaintiff's need to use a cane lacked support in Plaintiff's treatment records. (Tr. 25) The ALJ also found that Dr. Ali's diagnosis of mild osteoarthritis was inconsistent with the extreme limitations on walking and standing Dr. Ali endorsed. (Id.) Because of these inconsistencies, the ALJ assigned the opinion "little weight." (Id.)

In regards to Plaintiff's mental impairments, the ALJ considered Plaintiff's limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself. (Tr. 18-19) The ALJ found that Plaintiff had only mild or moderate limitations in all of these categories and thus, did not satisfy the requirements for any mental disorder listing. (Tr. 19-20) The ALJ considered the opinion of Dr. Bean, a consulting physician, who examined Plaintiff in December 2014 and noted "no major limitations." (Tr. 26) Because the ALJ found that this opinion was consistent with other treatment records, and because Dr. Bean was an examining physician, she assigned the opinion "great weight." (Id.)

The ALJ acknowledged that after Dr. Bean's evaluation, Plaintiff's "mental problems worsened." (Id.) However, the ALJ also noted that Plaintiff had not been fully compliant with her prescribed medications, reported several external stressors during that time, and made inconsistent statements to later examining physicians. (Tr. 26-27) The ALJ found that in 2016, Plaintiff "stabilized once she consistently received treatment." (Tr. 27)

Based on her review of Plaintiff's testimony and medical records, the ALJ concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (Tr. 29) The ALJ found that Plaintiff was unable to perform her past relevant work as an escalation forbearance manager, but was able to perform the requirements of unskilled, light

jobs such as packer, production worker, and product inspector. (Tr. 30) Based in part on the testimony of the vocational expert, the ALJ determined that Plaintiff was "capable of making a successful adjustment to other work" and Plaintiff was, therefore, not disabled. (Id.)

## V.    Discussion

Plaintiff claims that the ALJ's disability determination was not supported by substantial evidence because: (1) the ALJ assigned undue weight to the opinion of consultative psychologist, Dr. Bean; (2) improperly discounted the opinion of her treating pain specialist, Dr. Ali; and (3) improperly discredited Plaintiff's subjective complaints of pain. [ECF No. 23] Defendant counters that the ALJ properly considered the evidence of record as a whole, including the fact that Plaintiff "suffered from a number of chronic, longstanding mental and physical conditions, but yet was able to manage successful career as an escalation forbearance agent in collections for 13 years." [ECF no. 28 at 3]

### A.  Standard for Judicial Review

The court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). In determining whether the evidence is substantial, a court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, a court "do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as those determinations are supported by good reasons and substantial evidence." Renstrom v. Astrue,

680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that a court should "defer heavily to findings and conclusions" of the SSA. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

B.  Consulting Physician's Opinion

Plaintiff claims that the ALJ erred in assigning "great weight" to Dr. Bean's medical opinion because he was a one-time examiner who evaluated Plaintiff early in the application process. [ECF No. 23] Defendant responds that the ALJ properly evaluated the evidence as a whole and that Dr. Bean's opinion was consistent with subsequent medical records and Plaintiff's owns statements. [ECF No. 28]

In determining a claimant's RFC, the ALJ is required to consider the medical opinion evidence of record together with the other relevant evidence. 20 C.F.R. § 404.1527(b). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairments, including symptoms, diagnosis and prognosis, and what the claimant can still do despite her impairments and her physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). All medical opinions, whether by treating or consultative examiners, are weighed based on (1) whether the provider examine the claimant; (2) whether the provider is a treating source; (3) length of treatment relationship and frequency of examination, including nature and extent of the treatment

relationship; (4) supportability of opinion with medical signs, laboratory findings, and explanations; (5) consistency with the record as a whole; (6) specialization; and (7) other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c).

"As a general matter, the report of a consulting physician who examined a claimant once does not constitute 'substantial evidence' upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) (quoting Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000)). Here, the only medical opinion evidence rendered by a mental health professional was Dr. Bean's December 2014 assessment, which was based on a consultative examination and a single, ten-month-old medical note from Dr. Walker, Plaintiff's then treating psychiatrist.

In the consultative evaluation, Dr. Bean described Plaintiff as cooperative, responsive, and compliant, with a mood that was "a bit sad or dysphoric although this is punctuated at times with laughter or smiling related to appropriate content." (Tr. 443) Additionally, Dr. Bean observed that Plaintiff's thought processes were logical and goal directed, she was "well oriented times four responding quickly and to the point," her short and long term memory were intact, she had no articulation or language difficulties, and she was "able to focus, attend, and concentrate well." (Id.) Plaintiff denied suicidal thoughts, problems with low energy, or "euphoric or manic" episodes. (Id.)

The ALJ reviewed Dr. Bean's evaluation, noting in particular Plaintiff's reports to Dr. Bean that she "she had stopped working due to a layoff, not her impairments" and she "still sought work." (Tr. 26) The ALJ summarized Dr. Bean's assessment as follows: "Dr. Bean stated that the claimant did not demonstrate any difficulty with focus, attention, or concentration, seemed like she could manage her own finances, and could maintain relations and interact

effectively with others. Dr. Bean stated that only occasionally might the claimant's depressive symptoms or situational challenges affect her performance." (Id.) In support of her decision to assign Dr. Bean's opinion "great weight," the ALJ stated that it was "offered by [an] examining physician" and was "consistent with the other treatment records in this case." (Id.) Based on Dr. Bean's evaluation, the ALJ determined that Plaintiff had the RFC to maintain a full-time job with the following mental limitations: "[T]he claimant is limited to simple, routine tasks with minimal changes in job setting and duties; no handling of customer complaints; and no fast-paced production work." (Tr. 20)

"[T]he opinion of a nonexamining consulting physician is afforded less weight if the consulting physician did not have access to relevant medical records including relevant medical records made after the date of evaluation." McCoy v. Astrue, 648 F.3d 605, 515 (8th Cir. 2011) (citing Wildman v. Astrue, 596 F.3d 959 968 (8th Cir. 2010)). Here, Dr. Bean based his December 2014 evaluation, at least in part, on an incomplete medical record. Although Plaintiff was, at that time, receiving mental health treatment from psychiatrist Dr. Walker, Dr. Bean reviewed only one medical note from Dr. Walker, dated February 2014. At Plaintiff's February appointment with Dr. Walker, she was "doing pretty well" and her symptoms of depression were "mild." (Tr. 399) Dr. Walker's treatment notes from October and November, which Dr. Bean did not review, reflected a worsening of her depressive symptoms, including irritability, anxiety, poor concentration, disturbed sleep, and fatigue/lethargy.

Furthermore, Dr. Bean evaluated Plaintiff more than two years before the administrative hearing in March 2017. During the period of time between the evaluation and the administrative hearing, Plaintiff continued receiving treatment for her mental impairments and significant psychiatric events occurred, including four psychiatric hospitalizations. Plaintiff's medical

records reveal that, on November 9, 2015, she was admitted to a psychiatric center for mood stabilization and medication management. During that four-day stay, doctors adjusted Plaintiff's medication and diagnosed her with bipolar mood disorder. Plaintiff returned to the psychiatric facility on December 30 and received treatment for suicidal ideation. The facility discharged Plaintiff on January 7 but readmitted her on January 11 "due to suicidality." During this third stay, Plaintiff fashioned a noose from bedsheets and attempted to hang herself. The facility discharged Plaintiff on January 21 with the following diagnoses: major depressive disorder, severe, recurrent; post-traumatic stress disorder, chronic; and cannabis abuse. Plaintiff's fourth psychiatric hospitalization occurred in July 2016 and lasted seventeen days.

In addition to the suicide attempt and psychiatric hospitalizations, Dr. Bean did not have access to a number of significant medical records created after December 2014 showing Plaintiff's continued participation in and evaluation by BJC's Behavioral Health program, receipt of community-based services, continual prescriptions for and adjustments to psychotropic medications, and continued symptoms despite medication compliance. The amount of time that elapsed and the number of medically significant intervening events that occurred after Dr. Bean evaluated Plaintiff, were reasons for the ALJ to discredit Dr. Bean's opinion. See McCoy, 648 F.3d at 616; Carder v. Berryhill, No. 4:17-CV-2410-JMB, 2018 WL 4184327, at *9 (E.D. Mo. Aug. 31, 2018); Mayo ex rel. D.L. v. Astrue, 4:11–CV201 LMB, 2012 WL 996580, at 17 (E.D. Mo. Mar. 22, 2012).

While the ALJ reviewed and summarized evidence of the medical examinations and treatment Plaintiff received in the twenty-seven months after Dr. Bean's evaluation, the ALJ did not discuss how such evidence demonstrated that Plaintiff could maintain full-time work. Nor did the ALJ provide support for her finding that Dr. Bean's opinion was consistent with

Plaintiff's later medical records. As previously discussed, Plaintiff was in and out of a psychiatric facility from November 2015 through July 2016, when she relocated to St. Louis to live with her mother. In August 2016, Plaintiff established mental health care with Dr. Bohnenkamp, who regularly noted that she was restless, anxious, and tearful. A psychiatric examination performed in December 2016 stated that Plaintiff's mood and affect were anxious, sleep was poor, energy was decreased, memory was "not intact," and concentration was "limited." At Plaintiff's last recorded appointment with Dr. Bohnenkamp, which occurred approximately one month before the hearing, Plaintiff reported "uncontrolled anxiety, frequent crying spells and per mom, mood swings." Throughout Plaintiff's treatment, Plaintiff was placed on – and taken off – a myriad of psychotropic medications because they were ineffective. These medical records were not consistent with Dr. Bean's December 2014 evaluation finding Plaintiff had no problems with attention, concentration, or social interaction and her depressive symptoms might "only occasionally" affect her performance.

The ALJ appeared to consider evidence that Plaintiff wished to work and continued seeking throughout 2014 as evidence that she retained the mental RFC to work full-time in 2017. Under certain circumstances, contemplating work might suggest that the claimant does not view his or her condition as disabling, especially when the claimant alleges that pain prevents him or her from working. Morrison v. Astrue, 906 F.Supp.2d 839, 858 (N.D. Iowa 2012) (citing Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)). "The same is not true for mental impairments, where symptom-free periods are often inherently characteristic of such impairments." Id. The ALJ should "take into account evidence indicating that the claimant's true functional ability may be substantially less than the claimant asserts or wishes." Id. (quoting Parsons v. Heckler, 739 F.2d 1334, 1341 (8th Cir. 1984)).

Finally, to the extent the ALJ found that periods of stabilization suggested that Plaintiff's mental impairments were controlled or controllable by medication, the Court notes "symptom-free intervals do not necessarily compel…a finding [of not disabled] when a mental disorder is the basis of a [disability] claim" Wigfall v. Berryhill, 244 F.Supp.3d 952, 965 (E.D. Mo. 2017) (quoting Andler v. Chater, 100 F.3d 1389, 1393 (8th Cir. 1996)). As stated by the Eighth Circuit, "[i]t is inherent in psychotic illnesses that periods of remission will occur[.]…Indeed, one characteristic of mental illness is the presence of occasional symptom-free periods." Frederick v. Berryhill, 247 F.Supp.3d 1014, 1022 (E.D. Mo. 2017) (quoting Andler, 100 F.3d at 1393). Furthermore, "doing well for the purpose of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity." Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001).

Based on the above, the Court finds the ALJ's mental RFC and disability determination were not supported by substantial evidence.[5] "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir.2000). This is particularly true where, as here, the state agency psychological consultant rendered his opinion years earlier and, therefore, did not have access to numerous and significant medical records created thereafter. To accord great weight to Dr. Bean's opinion evidence in these circumstances was error.

### V. Conclusion

For the reasons stated above, the Court finds that the ALJ assigned undue weight to Dr. Bean's opinion and thus failed to properly assess Plaintiff's disability claim such that substantial

---

[5] Plaintiff also alleges that the ALJ erred in discounting Dr. Ali's opinion and discrediting her subjective complaints. Because the Court reverses on the basis of the undue weight assigned Dr. Bean's medical opinion, the Court does not address her other arguments.

evidence does not support the ALJ's determination. See, e.g., Gordon v. Astrue, 801 F.Supp.2d 846, 859 (E.D. Mo. 2011). Accordingly,

**IT IS HEREBY ORDERED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED** and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

An order of remand shall accompany this memorandum and order.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of August, 2019